J-A32020-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALFONSO PICONE | : | |
| | : | |
| Appellant | : | No. 2039 MDA 2016 |

Appeal from the Judgment of Sentence November 28, 2016
In the Court of Common Pleas of Schuylkill County Criminal Division at
No(s):  CP-54-CR-0002089-2015

BEFORE:   OTT, J., DUBOW, J., and STRASSBURGER, J.*

MEMORANDUM BY DUBOW, J.:                    **FILED FEBRUARY 23, 2018**

Appellant, Alfonso Picone, appeals from the Judgment of Sentence of 18 to 60 months' incarceration entered in the Schuylkill County Court of Common Pleas following his jury conviction of one count each of Theft by Unlawful Taking and Receiving Stolen Property.[1, 2]  We affirm.

The facts, as gleaned from the record, including the trial court's March 1, 2016 Opinion, are as follows.  In December 2014, Brian Campbell, a Protective Services Caseworker for the Schuylkill County Office of Senior Services, received a report that Appellant was financially exploiting an

_____

[1] 18 Pa.C.S. § 3921(a), and 18 Pa.C.S. § 3925, respectively.

[2] The jury also convicted Appellant of one count of Dealing in Proceeds of Unlawful Activities, 18 Pa.C.S. § 5111.  Before sentencing, however, the court granted Appellant's Motion for Judgment of Acquittal with respect to that conviction.

_____

*   Retired Senior Judge assigned to the Superior Court.

elderly couple in their nineties, John and Ella Burnard. Campbell investigated the report by conducting a visit with Mr. and Mrs. Burnard in their home on December 23, 2014. When Campbell informed Mr. Burnard of the reason for his visit, Mr. Burnard reported that he and his wife ate at the restaurant Appellant owned almost daily, and that Appellant helped them with their finances, but that he was not aware of any large changes in his bank accounts. Mr. Burnard signed a release of information allowing Campbell to check his bank records, and it soon became apparent to Campbell that Appellant had transferred a large amount of money to himself from the Burnards' accounts.

In January 2015, Campbell called the police and met with the Burnards again at their home, this time with Officer Thomas Fort of the Rush Township Police Department, and the Burnards' son, Kurt Burnard. At this meeting, Mr. Burnard indicated that he never intended Appellant to transfer this amount of money to himself, and that Appellant did not have the Burnards' permission to use their funds for his personal expenses.[3] Mr. Burnard explained that the couple had sought Appellant's help in managing their finances because Mrs. Burnard, who had always maintained the couple's finances, had begun to decline mentally and was no longer able to

---

[3] Campbell and Officer Fort both later testified that at their visits to the Burnards' home, Mrs. Burnard was incoherent and seemed very confused and she was unable to provide a statement to the investigators. N.T., 9/19/16, at 141, 147-48, 153, 166-67

do so. In addition, according to Campbell's review of the Burnards' financial records, Appellant had made himself a co-owner of the Burnards' bank and brokerage accounts, a fact the Burnards seemed not to understand fully.

Dennis Houser, a certified forensic public accountant, reviewed Appellant's and the Burnards' bank records. He testified at Appellant's Preliminary Hearing that Appellant had transferred $319,501.60 from the Burnards' accounts to Appellant over the course of 2014.[4] In July 2014, Appellant became a co-signor of the Burnards' Wells Fargo bank account. Appellant had transferred funds from the Burnards' brokerage account to the Wells Fargo account, where Appellant then transferred the funds to his personal accounts. Houser observed that the funds were going primarily into Appellant's business account for two restaurants and Appellant was using them for, *inter alia*, payroll, expenses, and operating costs. Appellant also wrote out three checks to himself to cover his personal expenses. Houser testified that there was no evidence that Appellant ever returned these funds to the Burnards. There was likewise no evidence that Appellant used the money to pay the Burnards' bills, as they paid most of their bills by automatic debit.

_____

[4] Appellant's defense against the charges ultimately filed against him was that the Burnards transferred funds to him as loans and gifts.

Houser examined the Burnards' bank records as far back as 2008. First, he found no history of giving gifts to anyone prior to the time of Appellant's involvement in the management of the Burnards' finances, particularly at these high amounts. Second, he identified inconsistencies in the transactions, including a number of bounced checks, which suggested to him that the Burnards had not intended the transactions to be gifts or loans. In particular, he detected a pattern whereby Appellant wrote out checks and Mrs. Burnard signed them, but there were insufficient funds to cover the checks when they were cashed. Houser found it unusual that the Burnards would have written a check for a loan or gift, but not have had sufficient funds in the bank to cover it.

On May 27, 2015, Police charged Appellant with two counts of Dealing in Proceeds of Unlawful Activities, and one count each of Theft by Unlawful Taking, Receiving Stolen Property, Theft by Deception—False Impression, Theft by Deception—Preventing Acquisition of Information, and Theft by Deception—Failure to Correct.[5]

On October 8, 2015, the court held a Preliminary Hearing. At the hearing, the Commonwealth presented the testimony of Campbell, Houser, and Officer Fort. John and Ella Burnard did not testify. Following the

_____

[5] 18 Pa.C.S. § 5111(a)(1); 18 Pa.C.S. § 3921(a); 18 Pa.C.S. § 3925(a); 18 Pa.C.S. § 3922(a)(1); 18 Pa.C.S. § 3922(a)(2); and 18 Pa.C.S. § 3922(a)(3), respectively.

hearing, the court dismissed the three Theft by Deception charges, and bound over the remaining charges for trial.

On December 4, 2015, Appellant filed a Pretrial Motion in which he moved the court to dismiss the remaining charges, averring that the Commonwealth failed to establish a *prima facie* case. Appellant argued that, because the Commonwealth failed to present the victims to testify at his Preliminary Hearing as to whether they had given their consent for Appellant to take their money, and presented no testimony regarding the victims' alleged incapacity, the Commonwealth's evidence was insufficient to satisfy, in particular, the intent element of the charges against him. Pretrial Motion, 12/4/15, at ¶¶ 6-8. The trial court denied this Motion on March 1, 2016.

On May 3, 2016, Appellant filed a Motion to Obtain an Independent Medical Examination of John Burnard and Ella Burnard and a separate Motion pursuant to Pa.R.Crim.P. 500 for Leave of Court to Preserve the Testimony of John Burnard and Ella Burnard. The court held a hearing on Appellant's Motions on May 16, 2016. At the hearing, the Commonwealth represented that it would not be presenting any expert testimony on the competence or cognitive abilities of the Burnards. Relying on this representation, Appellant withdrew his Motion for Independent Medical Exams. The trial court denied Appellant's Motion to Preserve, and scheduled a date for trial.

On July 15, 2016, Appellant filed a new Motion for mental health evaluations of John Burnard and Ella Burnard. On July 26, 2016, the court

held a hearing on the Motion after which it denied the Motion and deferred the matter for the time of trial.[6]

On August 5, 2016, the Commonwealth filed a Notice of Intent to use an expert witness, Dr. Kenneth Carroll, a psychologist, to testify about cognitive disorders generally, and Alzheimer's specifically. On August 9, 2016, Appellant filed a Motion to exclude that testimony.

On September 2, 2016, the court heard argument on Appellant's Motion to Exclude. The court ordered the Commonwealth's expert to produce a new report if he could make expert conclusions without relying on hearsay statements about Ella Burnard. Dr. Carroll produced an amended report, and, on September 13, 2016, Appellant filed an additional Motion to Exclude the amended report and Dr. Carroll's testimony. The court held a hearing on the Motion the next day, after which it granted Appellant's Motion, but permitted the Commonwealth to introduce first-hand lay witness testimony regarding Ella Burnard's mental state.

Appellant's four-day jury trial commenced on September 19, 2016. At trial, Campbell and Houser testified to the facts recounted **supra**. The Commonwealth also presented the testimony of other witnesses, including Nancy Kevilly, a friend of the Burnards, and the Burnards' son Kurt. Both witnesses testified about, among other things, Mrs. Burnard's failing mental

---

[6] Appellant learned at the hearing of Mrs. Burnard's June 13, 2016 death.

health, her deteriorating memory, and her strange behavior. *See* Trial Ct. Op, 2/16/17, at 4-5. Another witness, Kim Thomas, testified that she knew both of the Burnards and Appellant and that Appellant told her that he was "helping the Burnards pay their bills because they were older, becoming forgetful and not altogether there." *Id.* at 5.

Ultimately, the jury found the Commonwealth's evidence sufficient to prove that Appellant was aware of the Burnards' lack of mental capacity to make gifts and loans of their money to him, and convicted Appellant of Dealing in Proceeds of Unlawful Activities, Theft by Unlawful Taking, and Receiving Stolen Property. The court granted Appellant's Motion for Judgment of Acquittal with respect to the Dealing in Proceeds of Unlawful Activities conviction. On November 28, 2016, the court sentenced Appellant to concurrent terms of 18 to 60 months' incarceration, and ordered Appellant to pay restitution in the amount of $319,501.60. This appeal followed.[7]

Appellant raises the following six issues on appeal:

1. Was the evidence sufficient for convictions of [T]heft and/or [R]eceiving [S]tolen [P]roperty?

2. Were the verdicts against the weight of the evidence such that Appellant should be granted a new trial?

3. Was [it] error for the trial court to deny Appellant preservation of the testimony of the alleged complainant Ella Burnard[,] who died prior to trial?

---

[7] Both Appellant and the trial court complied with Pa.R.A.P. 1925.

4. Was Appellant denied Due Process and his right to confront witnesses when the trial court denied his motion of *Habeas Corpus*?

5. Was cross[-]examination limited by the trial court in such a way as to deprive Appellant of due process and right to fair confrontation?

6. Was Appellant denied a fair trial and should re-prosecution be barred when the prosecutor committed prosecutorial misconduct in suggesting before the jury that a key defense witness should be "advised of his rights."

Appellant's Brief at 4 (reordered for ease of disposition).[8]

In his first issue, Appellant challenges the sufficiency of the Commonwealth's evidence of his guilt of Theft by Unlawful Taking and Receiving Stolen Property.[9]

To begin, we note our standard of review of a challenge to the sufficiency of the evidence:

In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. Additionally, we may not reweigh the

_____

[8] Although not included in the Statement of Questions Involved, Appellant has also challenged the legality of the restitution portion of his sentence. *See* Appellant's Brief at 35-36. Claims directed to the trial court's authority to impose restitution concern the legality of sentence and cannot be waived. ***Commonwealth v. Oree***, 911 A.2d 169, 172-73 (Pa. Super. 2006). Thus, notwithstanding this omission, we will address this claim ***infra***.

[9] Appellant presents both insufficiency arguments in one argument section. We remind Appellant that our Rules require that an appellant divide the argument into as many parts as there are questions to be argued. Pa.R.A.P. 2119(a). Notwithstanding this error, we decline to find waiver on this basis.

evidence or substitute our own judgment for that of the fact finder. The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.

***Commonwealth v. Koch***, 39 A.3d 996, 1001 (Pa. Super. 2011) (citations omitted).

Evidentiary sufficiency presents a question of law, thus, our standard of review is *de novo* and our scope of review is plenary. ***Commonwealth v. Johnson***, 107 A.3d 52, 66 (Pa. 2014) (citation omitted).

A person commits the offense of Theft by Unlawful Taking "if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." 18 Pa.C.S. § 3921(a). To sustain a conviction of Receiving Stolen Property, the Commonwealth's evidence must establish that the defendant intentionally acquired possession or control, retained, or disposed of the movable property of another with knowledge that it was stolen or the belief that it was probably stolen. 18 Pa.C.S. § 3925.

Appellant argues that the testimony of John Burnard established that the "only reasonable interpretation of the evidence is that [Appellant] was gifted and loaned money by the Burnards[.]"[10] Appellant's Brief at 17, 18-

---

[10] Appellant also "expressly incorporate[d] the previously filed Motion for Judgment of Acquittal and for New Trial previously filed with the trial court as though fully presented herein" and notes that, since "this case turns on the testimony of John Burnard, he "urges this Court to read it in its entirety." Appellant's Brief at 16. Our Supreme Court has categorically

*(Footnote Continued Next Page)*

21. Appellant contends that the Commonwealth failed to present any evidence that he deceived the Burnards; rather the testimony of Mr. Burnard indicates that the Burnards intentionally and willfully transferred their money to Appellant. *Id.* at 18-19.

The trial court has authored a comprehensive, thorough, and well-reasoned Rule 1925(a) Opinion addressing Appellant's challenge to the sufficiency of the Commonwealth's evidence, including extensive references to the evidence upon which the jury could have relied in reaching its verdict. *See* Trial Ct. Op., 2/16/17, at 2-14 (concluding that, when viewed in the light most favorable to the Commonwealth as verdict winner, there was "sufficient evidence for the jury to find that [Appellant] took the Burnards' money by taking advantage of Ella Burnard's confusion and inability to understand what she was doing when she signed the checks. . . .The evidence established that [Appellant] intended to deprive the Burnards of their money when he took it, and he was aware that it was stolen when he received it"). We adopt that portion of the trial court's Opinion as our own, and affirm Appellant's first issue on the basis of that Opinion.

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯

rejected incorporation by reference as a means of presenting an issue. *See* ***Commonwealth v. Briggs***, 12 A.3d 291, 342–43 (Pa. 2011) (citations omitted) (stating that, where an appellant incorporates prior arguments by reference in contravention of Pa.R.A.P. 2119(a) and (b), he or she waives such claims on appeal). Thus, we will consider only the argument presented to this Court in Appellant's Brief.

- 10 -

In his second issue, Appellant challenges the weight the jury gave to the Commonwealth's evidence.

> A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Accordingly, an appellate court reviews the exercise of the trial court's discretion; it does not answer for itself whether the verdict was against the weight of the evidence. It is well settled that the jury is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the jury's verdict is so contrary to the evidence that it shocks one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

*Commonwealth v. Houser*, 18 A.3d 1128, 1135-36 (Pa. 2011) (citations omitted).

Appellant argues in this issue that the court erred in denying his Motion for a New Trial because the evidence at trial "clearly demonstrates that all of the money received from the Burnards represented either a gift or a loan."[11] Appellant's Brief at 23.

Over the course of Appellant's four-day trial, the Commonwealth presented the testimony of many witnesses who attested to the diminishment of Mrs. Burnard's memory and mental acuity. In fact, the

---

[11] As with his sufficiency of the evidence claim, Appellant has incorporated by reference the arguments he raised in his Motion for a New Trial. As noted *supra*, Pa.R.A.P. 2119(a) and (b) prohibit this practice, and we, thus, shall address only the arguments set forth in Appellant's Brief.

- 11 -

evidence indicates that this is precisely the reason underlying Appellant's involvement in "assisting" the couple with their finances in the first place. Appellant's spare argument highlights the parts of Mr. Burnard's testimony that are favorable to Appellant, and omits any discussion of the ample evidence of Mrs. Burnard's incapacity provided by the Commonwealth's other witnesses. The jury decision to credit the testimony of the Commonwealth's witnesses and evidence is not shocking to this Court. The jury's verdict was far from manifestly unreasonable. Thus, we conclude the trial court did not abuse its discretion in denying Appellant's Motion for a New Trial.

In his third issue, Appellant claims that the trial court erred in denying his Motion for Leave to Preserve the Testimony of John Burnard and Ella Burnard. Appellant's Brief at 23-24.

Appellant's argument is significantly underdeveloped as he has failed to support this theory with citation to any case law in violation of Pa.R.A.P. 2119(a). Appellant's failure to develop this issue precludes this Court's meaningful review. *See Commonwealth v. Johnson*, 895 A.2d 915, 924-25 (Pa. Super. 2009) (appellant waives issue on appeal if he fails to present claim with citations to relevant authority or develop issue in meaningful fashion capable of review). Accordingly, we find this argument waived.

In his fourth issue, Appellant avers that the trial court erred in denying his Motion for *Habeas Corpus*. Appellant complains that the court should

have granted his Motion because the Commonwealth's "strategic decision" not to present Mrs. Burnard's testimony at his Preliminary Hearing deprived him of his right to confront his alleged victim. Appellant's Brief at 27.

Appellant included this issue in his Rule 1925(b) Statement. In it, he claimed: "The trial court erred when it denied [Appellant's] Omnibus Motion for *Habeas Corpus*; [Appellant] was denied right of confrontation and Due Process." Rule 1925(b) Statement, 1/19/17, at 2 (unpaginated). In declining to address this issue, the trial court noted that Appellant failed to "explain the manner in which his rights were denied." Trial Ct. Op. at 16.

When the trial court directs a defendant to file a concise statement of matters complained of on appeal, any issues that are not raised will be waived for appellate review. **Commonwealth v. Dowling**, 778 A.2d 683, 686 (Pa. Super. 2001). Similarly, if a defendant raises an issue in his Rule 1925(b) statement in a way that is too vague for the trial court to identify and address, the statement is the functional equivalent of no statement at all. **Id.**

Here, the trial court found Appellant's statement of this allegation of error too vague and imprecise to address with any specificity, and summarily concluded that "[t]he ultimate right to confront the witnesses and test the sufficiency of the evidence was afforded at trial." Trial Ct. Op. at 16. We agree with the trial court that Appellant failed to raise this issue in his Rule

- 13 -

1925(b) Statement with the requisite specificity to have preserved it. Thus, we find this issue also waived.

In his fifth issue, Appellant avers that the trial court deprived Appellant of his due process rights and right to confront his adverse witnesses when it limited the scope of his counsel's cross-examination of Dennis Houser and John Burnard by sustaining the Commonwealth's objections to counsel's questions. Appellant's Brief at 27, 29, 30-31.

With respect to Houser, Appellant alleges that the trial court erred in preventing his counsel from questioning Houser about evidence of checks totaling more than $100,000.00 written by the Burnards between May and July 2014 to Mikey Stocker, the son of the Burnards' investment advisor. *Id.* at 29. Appellant argues that evidence of these checks contradicts Houser's testimony that the Burnards' records did not indicate a pattern of giving large financial gifts, like those Appellant alleges the Burnards gave to him. *Id.*

Appellant also claims that the trial court limited cross-examination of John Burnard by not permitting Appellant's counsel to ask specific questions related to the sale of the Burnards' Reston, Virginia home. *Id.* at 30-31. Appellant argues that John Burnard's answers to questions about details of this transaction were relevant to illustrate that the Burnards had been monitoring their financial transactions. *Id.* at 31.

Preliminarily, we note that "[i]t is an appellant's duty to present arguments that are sufficiently developed for our review." ***Commonwealth v. Hardy***, 918 A.2d 766, 771 (Pa. Super. 2007). Appellant alleges that during cross-examination the trial court erroneously sustained an objection by the Commonwealth to Houser's testimony. However, Appellant has not included in his Brief a citation to the place in the Notes of Testimony where the Commonwealth made such an objection, the specific objection he alleges the Commonwealth made, or a citation to the place in the record where the trial court resolved the objection.[12] This is unacceptable and a clear violation of Pa.R.A.P. 2119(c).[13] This Court has consistently held that failure to comply with Rule 2119(c) results in the wavier of the issue on appeal. ***See***, ***e.g.***, ***Commonwealth v. Hetzel***, 822 A.2d 747, 765 (Pa. Super. 2003). We are, thus, compelled to find this issue, as it pertains to Houser's testimony, waived.

With respect to Appellant's claim that the court improperly limited John Burnard's testimony, we note that the scope of cross-examination is largely

---

[12] In its Opinion addressing this issue, the trial court indicated that Appellant failed to provide "transcript references where the objections were raised" in his Pa.R.A.P. 1925(b) Statement. Trial Ct. Op. at 18.

[13] Pa.R.A.P. 2119(c) requires that "[i]f reference is made to the pleadings, evidence, charge, opinion or order, or any other matter appearing in the record, the argument must set forth, in immediate connection therewith, or in a footnote thereto, a reference to the place in the record where the matter referred to appears[.]"

within the discretion of the court and we will not reverse the trial court's decision absent a clear abuse of discretion or error of law. *Commonwealth v. Begley*, 780 A.2d 605, 627 (Pa. 2001).

The right to cross-examine witnesses, though fundamental, is not absolute. *See Commonwealth v. Rosser*, 135 A.3d 1077, 1088 (Pa. Super. 2016) (*en banc*). The Confrontation Clause of the Sixth Amendment of the United States Constitution provides a defendant with a constitutional right to conduct cross-examination that reveals any motive that a witness may have to testify falsely. *Commonwealth v. Bozyk*, 987 A.2d 753, 756 (Pa. Super. 2009). However, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, and prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.*

Appellant argues in his Brief that, with this line of inquiry, his counsel sought to show that the Burnards were regularly reviewing their investment and bank account statements as the "Burnards' understanding of giving money to Appellant is the central issue in this case[.]" Appellant's Brief at 31.

The trial court explained that it sustained the Commonwealth's objection to the scope of Appellant's cross-examination of Mr. Burnard because Appellant had already elicited the testimony it was seeking from Mr.

Burnard—that the Burnards were reviewing their investments—without inquiring into the specifics of sale of the Burnards' Reston, Virginia home, which was not at issue in this case.[14] ***See*** Trial Ct. Op. at 19.

Following our review, we conclude that the trial court did not abuse its discretion in limiting the scope of Appellant's cross-examination of Mr. Burnard to issues immediately relevant to this matter. At the time the Commonwealth objected to the scope of Appellant's cross-examination, Mr. Burnard had already testified that he and his wife were reviewing their financial records and aware of their contents. The trial court did not abuse its discretion in determining that, given the possibility of jury confusion of the issues and unnecessary repetitiveness, the details of the Reston, Virginia real estate transaction were not relevant to the instant charges. Thus, we conclude Appellant is not entitled to relief on this issue.

In his sixth issue, Appellant claims that the court erred in denying his Motion for a Mistrial when the Commonwealth committed prosecutorial misconduct when asking the court, in the presence of the jury, to advise Leo Howell, Esquire, a defense witness, of "certain of his rights." Appellant's Brief at 31.[15] Appellant's claim is based on the following occurrence at trial.

---

[14] N.T., 9/19/16, at 95.

[15] Here, again, Appellant incorporates by reference the arguments set forth at the time of trial in support of his Motion for a Mistrial. To the extent that those arguments are not included in Appellant's Brief, we will not consider them.

After Appellant called Leo Howell, Esquire, to testify regarding a document pertaining to an *inter vivos* gift that Mr. Howell had prepared at Appellant's request for Mrs. Burnard's signature, the prosecutor asked that the witness be advised of his rights before testifying. Appellant's counsel objected. At sidebar, Appellant indicated that he was "tempted" to ask for a mistrial. The court admonished the prosecutor and the sidebar ended. The court then excused the jury. The court advised Howell of his right against self-incrimination, after which Howell indicated he wanted to consult with counsel. After a brief interlude, Appellant's counsel stated that Howell no longer wished to testify and he was "renewing" the Motion for a Mistrial. A colloquy ensued where Howell informed the court that he felt threatened by the Attorney General's office. Appellant's counsel then requested that the court dismiss the case.

The court denied Appellant's Motion for a Mistrial and his request for a dismissal, and recessed for lunch to allow Howell to consult further with counsel. After the lunch break, Appellant's counsel indicated Howell had changed his mind and would testify, which he did shortly thereafter. **See** Trial Ct. Op. at 21-22 (citing N.T., 9/21/16, at 542-64).

Appellant avers the trial court should have granted a Motion for a Mistrial because the prosecutor's statement prejudiced his ability to have a fair trial. Appellant's Brief at 33-34. We review the denial of a motion for a

mistrial for an abuse of discretion. ***Commonwealth v. Tejada***, 834 A.2d 619, 623 (Pa. Super. 2003).

> A mistrial upon motion of one of the parties is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial. It is within the trial court's discretion to determine whether a defendant was prejudiced by the incident that is the basis of a motion for a mistrial. On appeal, our standard of review is whether the trial court abused that discretion.

> An abuse of discretion is more than an error in judgment. On appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised by the trial court was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will.

***Id.*** at 623 (citations and quotations omitted).

Prosecutorial misconduct will justify granting a mistrial only where the unavoidable effect of the conduct is to prejudice the jury to the extent that it is rendered incapable of fairly weighing the evidence and entering an objective verdict. ***Commonwealth v. Pierce***, 645 A.2d 189, 196 (Pa. 1994). ***See also Commonwealth v. Chmiel***, 777 A.2d 459, 464 (Pa. Super. 2001) (noting a mistrial is appropriate where the "unavoidable effect of the contested comments was to prejudice the jury, forming in their minds fixed bias and hostility towards the accused so as to hinder an objective weighing of the evidence and impede the rendering of a true verdict.").

Further, "the double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant [ ] when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, [and] when the conduct

of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." **Commonwealth v. Smith**, 615 A.2d 321, 325 (Pa. 1992).

Appellant avers that the prosecutor's statement was "clearly an attempt to prejudice the jury into conjecture as to possible prior misconduct of the witness and thus deny due process." Appellant's Brief at 34.

The trial court addressed the issue as follows:

> It was my judgment that the suggestion that the witness should be advised of his rights before testifying, followed by the witness' decision to do so[,] did not render the jury incapable of entering an objective verdict or even objectively weighing Mr. Howell's testimony. Had I advised the jury that advising a witness of his rights does not reflect a judgment on his credibility, I believe that a question of credibility may have been planted in the jurors' minds. However, merely taking [ ] an extended recess before he testified might very well have suggested to the jury that the witness had considered his rights and felt no concern about providing testimony.

Trial Ct. Op. at 23.

Our review of the record supports the trial court's denial of the Motion for a Mistrial. The record does not support Appellant's averment that the prosecutor "intended to provoke the defendant into moving for a mistrial." Moreover, the prosecutor's comment was not of such a nature as "to hinder an objective weighing of the evidence and impede the rendering of a true verdict." **Chmiel**, **supra** at 464. Thus, we conclude that the trial court did not abuse its discretion denying Appellant's Motion for a Mistrial.

In his final issue, which he omitted from his Statement of Questions Involved, Appellant claims that the trial court erred in ordering him to pay restitution in the amount of $319,501.60 because the Commonwealth failed to prove what portion of the funds transferred from the Burnards' accounts were either a gift or a loan. Appellant's Brief at 35. Appellant argues that the restitution portion of his sentence was, thus, entirely speculative and unsupported by the record. *Id.* at 35-36.

An appeal from an order of restitution based upon a claim that a restitution order is unsupported by the record challenges the legality of sentencing. ***Commonwealth v. Redman***, 864 A.2d 566, 569 (Pa. Super. 2004). Our standard of review in cases dealing with questions of law is plenary. ***Commonwealth v. Hughes***, 986 A.2d 159, 160 (Pa. Super. 2009).

The statute governing restitution for injuries to person or property, 18 Pa.C.S. § 1106, provides that:

> (a)  General rule.--Upon conviction for any crime wherein property has been stolen, converted or otherwise unlawfully obtained, or its value substantially decreased as a direct result of the crime, or wherein the victim suffered personal injury directly resulting from the crime, the offender shall be sentenced to make restitution in addition to the punishment prescribed therefor.

18 Pa.C.S. § 1106(a). The statute defines restitution as "[t]he return of the property of the victim or payments in cash or the equivalent thereof pursuant to an order of the court." 18 Pa.C.S. § 1106(h).

"In computing the amount of restitution, the court shall consider the extent of injury suffered by the victim and such other matters as it deems appropriate." *Commonwealth v. Dohner*, 725 A.2d 822, 824 (Pa. Super 1999) (quoting 18 Pa.C.S. § 1106(c)(2)(i)). Because restitution is a sentence, the record must support the amount ordered, and the amount of restitution must not be speculative or excessive. *Id.* at 824. "The amount of a restitution order is limited by the loss or damages sustained as a direct result of defendant's criminal conduct and by the amount supported by the record." *Id.* (citation omitted). To determine the correct amount of restitution for injuries to a person or property, the court should employ a 'but for' test to ascertain which damages occurred as a direct result of the defendant's criminal conduct. *Commonwealth v Oree*, 911 A.2d 169, 174 (Pa. Super. 2006).

Appellant avers that the restitution portion of his sentence is speculative and unsupported by the evidence of record. We disagree.

Our review of the record indicates that the Commonwealth presented evidence that amply supports the court's conclusion that all of the money transferred to Appellant was transferred as a result of his criminal conduct. The Commonwealth presented Mr. Burnard's testimony that: (1) Appellant did not have permission to transfer to himself over $300,000.00 of the Burnards' money; (2) to his knowledge, Mrs. Burnard did not give Appellant permission to take their money; and (3) any money "given" to Appellant was a loan which the Burnards intended Appellant to repay. The Commonwealth

also presented evidence that at no time prior to 2013, when Mrs. Burnard's mental capacity began to diminish and Appellant became involved in managing the Burnards' finances, did the Burnards ever make financial gifts or loans to Appellant. The Commonwealth presented further evidence of Appellant's suspicious pattern of writing checks against the Burnards' checking account on temporary checks and failing to record them in the Burnards' check register. Last, and critically, the Commonwealth presented voluminous evidence from which "the jurors could have, and apparently did conclude that [Mrs. Burnard] was not capable of forming the donative intent to give [the Burnards'] money to [Appellant]." Trial Ct. Op. at 24. Thus, given this robust evidence in support of the court's restitution award, we conclude that Appellant's claim lacks merit.

Judgment of Sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/23/2018

- 23 -

COURT OF COMMON PLEAS OF SCHUYLKILL COUNTY--CRIMINAL

COMMONWEALTH OF PENNSYLVANIA :     NO.    CR-2089-2015

          vs.                       :

ALFONSO PICONE,              :

             Defendant       :

Michelle A. Laucella, Deputy Attorney General - for the Commonwealth
Ross Miller, Esquire - for the Defendant

## *OPINION OF COURT PURSUANT TO Pa.R.A.P. 1925*

BALDWIN, P.J.

Following a trial by jury, the defendant was found guilty of one count each of Dealing in Proceeds of Unlawful Activities,[1] Theft by Unlawful Taking,[2] and Receiving Stolen Property.[3] Before sentencing, the defendant's motion for judgment of acquittal was granted with respect to the charge of dealing in proceeds of unlawful activities. He was given concurrent sentences of 18 to 60 months for theft by unlawful taking and receiving stolen property.

---

[1] 18 Pa.C.S. §5111
[2] 18 Pa.C.S. §3921(a)
[3] 18 Pa.C.S. §3925

Following the defendant's timely notice of appeal, he was ordered to file a statement of matters complained of on appeal. His statement was filed on January 19, 2017.

## Sufficiency of Evidence

The first issue raised in that motion questions the sufficiency of evidence to support the convictions for theft by unlawful taking and receiving stolen property. To sustain a conviction of theft by unlawful taking, the Commonwealth's evidence must establish that the defendant took, or exercised unlawful control over the movable property of another with the intent to deprive the other of the property. 18 Pa.C.S. §3921(a). To sustain a conviction of receiving stolen property, the Commonwealth's evidence must establish that the defendant intentionally acquired possession or control, retained, or disposed of the movable property of another with knowledge that it was stolen or the belief that it probably was stolen. 18 Pa.C.S. §3925.

Reviewing a sufficiency claim, a court must view all the evidence submitted at trial, as well as all reasonable inferences that may be drawn therefrom, in the light most favorable to the Commonwealth as the verdict winner; and through that lens, the court must determine whether each element of the offense has been proven beyond a reasonable doubt. *Commonwealth v. Woodruff*, 447 Pa. Super. 222, 668 A.2d 1158 (1995).

2

John Burnard testified that, at the time of the offenses, he and his wife Ella, resided at Lake Hauto in Schuylkill County. He was born in Bangor, Pennsylvania, and lived there until he joined the Navy at age eighteen. He was a boatswain's mate in an LST during the D-Day invasion. After the war, he worked as a research chemist before returning to East Bangor, where he settled down and married his first wife, Elizabeth. They adopted a son and daughter.

Mr. Burnard was then employed by a group that did research for the newspaper industry. It was at this job that he met Ella, who was employed by the same company. Eventually, Mr. Burnard and his first wife were divorced, and he and Ella were married in 1950. After both Burnards retired, they moved to Lake Hauto.

Dennis Houser, a forensic accountant, testified that the money the Burnards had accumulated during their work life was deposited into a checking account at Wells Fargo Bank, two investment accounts with Stifel Nicolaus, and two Stifel Nicholas accounts that each held only a single life insurance policy, one each for Mr. and Mrs. Burnard. The investment accounts had a related cash account, into which funds deposited by the Burnards or dividends earned on investments would be deposited until the cash was used to buy more securities. The Burnards could write checks on the cash account, but if the amount of the check exceeded the cash account balance, the difference would be treated as a loan to the Burnards. They would be charged interest on the loan until enough of their securities could be liquidated to satisfy the loan balance.

3

John Burnard testified that over the years, Ella was in charge of paying their bills and managing the checkbook. He described how, as they aged, Ella began to have memory problems and could no longer manage their financial affairs.

At the time of the offenses, John Burnard was ninety-one. He testified that Ella sought help in paying their bills. Their children lived away from them. It was not clearly explained how the defendant got involved in managing the Burnards' finances, but John testified that Ella had turned to the defendant for help in doing so.

The defendant was the owner-operator of a popular Italian restaurant in nearby Tamaqua, and the Burnards were frequent patrons, as Mrs. Burnard could no longer prepare meals at home. The defendant, who was known to everyone as "Alfie," was very friendly toward the Burnards. Their son, Kurt, described accompanying his parents to the restaurant during his visits and how the defendant treated the Burnards like celebrities when they entered the restaurant, fussing over them and letting everyone in the restaurant know that the Burnards were there.

John Burnard was not the only one who saw how Ella had slipped mentally. Nancy Kevilly testified that she and her husband had retired to Lake Hauto as the Burnards had. The Kevillys and the Burnards were part of a senior group that gathered weekly at the community center to play cards. She testified that Ella Burnard was a good card player, but by 2013, Ella had forgotten the rules of the game and could not remember what she had done on her last play. Her memory had deteriorated to the point

4

that no one wanted to sit at Ella's table except for her husband and a friend who patiently instructed Ella what she was permitted to do on each play.

Kurt Burnard described how Ella's mental capacity was fading and how she was acting strangely. When he visited his parents for the Fourth of July in 2014, instead of sitting with her family, Ella was wondering around the other people's tables and eating their food.

The defendant also was aware that Ella had slipped mentally. Kim Thomas testified that, during 2014, she and her husband were dining in the defendant's restaurant and seated nearby the Burnards' table. They saw the defendant with the Burnards, and he came to their table to talk. Mrs. Thomas was the office manager at the Lake Hauto Club and knew the Burnards. She asked the defendant if he knew them, and he told her he was helping the Burnards pay their bills because they were older, becoming forgetful and not altogether there.

Kurt Burnard also testified whenever he and his parents were at the restaurant toward the end of 2014, the defendant would comment to Kurt how Ella was having a bad day and was not with it.

Brian Campbell is a protective service investigator for the Schuylkill County Office of Senior Services. In December of 2014, his office had received a report of possible financial abuse of the Burnards by the defendant. On December 23 of that year, he made an unannounced visit to the Burnards' home. John Burnard answered the door,

5

invited Mr. Campbell in, and yelled into another room for Ella to come out because they had company. When Mrs. Burnard joined them, she was not wearing pants and did not seem to realize it. Mr. Burnard had to tell her to get dressed. Campbell testified that while he spoke to John Burnard, Ella just sat quietly looking ahead until she stood up and, for no reason, handed Mr. Campbell a photo of her brother. At another point, she went to the kitchen and returned with a Christmas cake in a box and tried to hand it to Campbell without explanation.

Brian Campbell returned to the Burnard residence on January 12, 2015, and obtained a statement from John Burnard. He took no statement from Ella Burnard because she appeared to not understand what was being discussed regarding the Burnards' bank records.

Campbell's next visit to the Burnard residence was with Assistant Attorney General Laucella in August of 2015. This was a prearranged visit, and yet Ella Burnard again received them in a state of undress and had to be told by Kurt Burnard to get dressed. During attempts to question Mrs. Burnard, her answers were not responsive to the questions.

Dennis Houser had examined the Burnards' financial records and those of the defendant and of his restaurant. Mr. Houser testified that prior to 2014, the Burnards' income exceeded their expenses by about $1,000 per month. Beginning in late 2013, he began to see a pattern of checks written to the defendant in large amounts.

6

Mr. Houser testified regarding numerous transactions involving both the Burnards' checking account at Wells Fargo Bank and their retirement account at Stifel Nicholas which transactions benefited only the defendant or his restaurant. The first was on August 26, 2013, when Ella Burnard signed a cash withdrawal in the amount of $10,000. There was no specific proof of where the money was spent, but the defendant had been helping Ella Burnard to pay her bills at that time. This transaction was not made part of the charges against the defendant.

Mr. Houser had examined the Burnard's check register and observed that each check and deposit was meticulously recorded until 2013. At that point, the checks that were recorded were done by a different hand with abbreviations. Some payments were made with temporary checks that were not recorded in the register. Two temporary checks were written in January and February of 2014, totaling $40,000. Both were signed by Ella Burnard, made payable to Defendant, and deposited into a joint account of the defendant and his mother.

In March of 2014, there was a check drawn on the Burnards' Wells Fargo account for $7,500 and, a week later, another drawn on their retirement account for $10,000. Both were signed by Ella Burnard, made payable to the defendant, and deposited into his joint account with his mother. Ten days later, on April 1, there was another check drawn on the retirement account for $35,000, signed by Ella, made payable to the defendant, and deposited into the same joint account.

7

In May, a temporary check was drawn on the Wells Fargo account in the amount of $6,500, signed by Ella, payable to Alfonso Picone, and deposited into the restaurant business account. Just five days later, a check was drawn on the retirement account, in the amount of $30,000, signed by Ella, payable to the defendant, and deposited into the joint account of the defendant and his mother. Nine days later, another check was drawn on the retirement account in the amount of $30,000, payable to the defendant, and deposited into the same joint account.

In June of 2014, two more checks were drawn on the retirement account. The first, in the amount of $30,000, was payable to the defendant and deposited into the joint account. The second, three days later, in the amount of $15,000, was payable to the restaurant, and deposited into the restaurant's business account. Both were signed by Ella Burnard.

In July, another check, in the amount of $35,000, was drawn on the retirement account. It was signed by Ella, made payable to the defendant, and deposited into the same joint account.

In August, Stifel Nicholas returned a $35,000 check payable to Alfonso Picone in the amount of $35,000 because the cash account was too overdrawn. It was redeposited and returned a second time. Later in August, a check in the amount of $15,000 was drawn on the retirement account. It was signed by Ella, made payable to the defendant,

8

and deposited into his joint account. Fifteen days later a $10,000 check was drawn on the retirement account. That too was returned because the cash account was overdrawn.

Throughout the trial, the defense sought to portray the checks drawn on the Burnards' accounts as gifts from Ella Burnard. Mr. Houser had examined the Burnards' gifting patterns. He found no pattern of large gifts. Kurt Burnard testified that his parents never gave large gifts, even to their children. Houser further pointed out that people do not make gifts by writing checks on accounts with insufficient funds, referring to the checks that had been returned by Stifel Nicholas.

By September of 2014, the defendant had convinced the Burnards to add his name as an authorized signatory on their Wells Fargo account. He used that power to make a cash withdrawal of $7,500 on September 17. Five days later the defendant wrote a $5,000 check on that account to the restaurant. Three days after that a $35,000 check was drawn on the retirement account but was returned for insufficient funds.

In October through December of 2014, the defendant wrote checks on the Burnards' Wells Fargo account totaling $32,001.16. The money was used to remodel the defendant's home. Also in December, the defendant withdrew another $9,000 in cash from the account.

Mr. Houser had examined casino records that indicated sizable buy-ins by the defendant in 2014: $27,450 in April, $39,920 in May, $39,020 in June, $17,840 in July, $33,160 in August, $47,770 in September, $19,050 in October, $36,950 in November,

9

$30,920 in December, and $48,590 in January of 2015. The restaurant business records showed its account to be consistently overdrawn during 2014. Food suppliers were returning checks for insufficient funds. Without the Burnards' money, paid either directly to the restaurant or transferred to the restaurant from the defendant's joint account using funds acquired from the Burnards' accounts, the restaurant could not have paid its bills. Although the restaurant was very popular, according to its business records, it received not one dollar of cash receipts during July of 2014.

When the records of the Burnards accounts, the defendant's personal bank records, the financial records of the restaurant, and the records of the defendant's gambling activity are considered together, there is ample evidence from which the jury could infer that the defendant had been draining cash from the business for his gambling activities. Mr. Houser described how, throughout 2014, the business account of this popular restaurant was consistently overdrawn to the extent that its checks to suppliers were being returned for insufficient funds. The jury could readily have concluded that cash was being removed from the business and not appearing on its books, particularly when the records showed zero cash receipts for an entire month. The business was a family operation, and the defendant's family members would have been financially harmed if the restaurant's cash receipts were not replenished by money from the Burnards.

Throughout the trial, the defense sought to establish that the checks drawn on the Burnards' accounts were gifts from Ella Burnard to Alfonso Picone. There was no

10

evidence that the Burnards made any gifts to the defendant before he began to help Ella with the bills. The jury clearly did not believe that they gifted over $300,000 to Alfonso Picone in one year.

Ella Burnard was not capable of paying their normal household bills. She had forgotten how to play card games at which she had been a good player. She did not even realize that she was not fully clothed when receiving visitors at her home. The defendant acknowledged to others that the Burnards needed his help because they were not altogether with it.

There was sufficient evidence from which the jury could conclude that Ella Burnard lacked the mental capacity to consciously give away so much of the assets she and her husband had accumulated over their working lives. The defendant needed cash to support his gambling and his business. Ella Burnard could be easily tricked into giving him the money for both and even to remodel his house.

John Burnard, while more aware than Ella, clearly did not feel capable of stepping in to pay the bills when Ella began to falter, or there would have been no reason to involve the defendant with their bills. John did testify that he saw the check register, but many of the checks to Picone were not recorded in the register, and no running balance was kept after the defendant took over paying their bills. Occasionally a check to Picone was recorded in the register with a notion that it was a loan. A number of the payments to Picone were written on temporary checks obtained from the bank, even though the

11

Burnards had regularly numbered checks available. These temporary checks were not recorded in the check register.

During cross-examination, John Burnard acknowledged knowing that his wife had made some gifts to the defendant, but when asked by defense counsel about three of the transactions, he said that he understood that his wife had given that money to Picone as a no interest loan to be repaid. After receiving that response, defense counsel asked him about no other transactions.

The jury clearly concluded that the "loans" were never intended to be repaid. In fact the defendant offered the testimony of Leo Howell, an attorney who had represented the defendant and another family member. Howell was retained by the defendant to prepare a document for Ella Burnard to sign by which Ella purports to verify that she had the mental capacity to make a gift, was under no undue influence, and intended that five of the checks which the defendant had cashed were gifts. He met with her and the defendant at the restaurant. Howell testified that Ella Burnard read the document before signing it and appeared to understand it. It was brought out during cross-examination that Howell attended Picone's preliminary hearing, although he was not representing Picone criminally. There was no explanation as to why John Burnard was not included in the meeting or asked to sign the document involving checks drawn on an account of which he was a joint owner. Although the document included signature lines for witnesses, they were left blank; however one of the defendant's employees notarized

12

Ella's signature. It would appear that the jury did not find Mr. Howell's testimony to be credible.

The thrust of the defendant's arguments is that Ella Burnard, as one of the joint owners of the Burnard accounts, was so fond of Alfonso Picone that she voluntarily chose to give him over $300,000 of her and her husband's life savings. However, as discussed, there is evidence to support a conclusion by the jury that Ella Burnard, at the time she signed the checks to the defendant and his restaurant, lacked the mental capacity to understand what the defendant was asking her to do. There is also evidence from which the jury could conclude that John Burnard was told that any money given to the defendant was as a loan; that the defendant never intended to repay the money; and that the defendant concealed the full amount he was taking by using temporary checks and not recording the checks in the check register.

There was sufficient evidence for the jury to find that Picone took the Burnards' money by taking advantage of Ella Burnard's confusion and inability to understand what she was doing when she signed the checks. She took her checkbook to him because she was no longer capable of figuring out how to write checks to pay their monthly expenses. She was depending on the defendant to make out the checks and tell her what to sign. The evidence established that he intended to deprive the Burnards of their money when he took it, and he was aware that it was stolen when he received it.

13

There was also evidence that some of the checks were represented to John Burnard as loans, but which the defendant did not intend to repay, instead getting Ella Burnard to sign a document purporting to convert the loans to gifts. While the charge of theft by deception was not pursued at trial, the charge of receiving stolen property requires only that the perpetrator receive and retain property of another with knowledge it was stolen. The statute does not require that the property be stolen in any specific way.

## Weight of Evidence

The defendant challenges the decision of this court to deny his motion for new trial based on the assertion that the verdict was against the weight of the evidence. There is nothing to suggest that the jury's verdict was manifestly unreasonable or that it was the result of bias or prejudice. The evidence established that the defendant took advantage of the cognitive limitations of an elderly couple to take over $300,000 of their life savings.

## Preservation of Testimony

The defendant asserts that the Court erred by denying his motion to depose the Burnards pursuant to Pa.R.Crim.P. 500. That motion was filed on May 3, 2016, along with a request to have the Burnards' submit to a mental health examination. By that time, the defendant's case had been attached for trial three times.

The case was first attached for trial on December 28, 2015. Jury selection was to begin on January 26, 2016. The case was removed from the trial list because the defendant filed an omnibus motion in the form of a petition for a writ of habeas corpus.

14

The Burnards had not testified during the preliminary hearing, and defense counsel from the outset was suggesting that they were not competent to testify because of dementia. The evidence presented at trial established that Ella Burnard certainly would not have been competent to testify. By 2014, she was no longer capable of paying the couple's bills, had forgotten how to play cards, was receiving household guests without being aware that she was only partially clothed, could not follow the conversation between Brian Campbell and her husband, and had begun acting strangely.

When the defendant's omnibus motion was denied, the case was again attached for trial with jury selection to begin March 29, 2016. The defendant's response was to petition the court to certify the denial of the omnibus motion for interlocutory appeal and seek a continuance to allow additional time to prepare for trial. Only the continuance was granted.

On April 1, 2016, the case was again attached for trial for the next term of Criminal Court with jury selection to begin June 1. On May 3, the defendant filed both a request to submit the Burnards to a mental health examination and a motion to preserve their testimony by deposition.

By this time, I became concerned that the defendant was engaging in delay tactics with the hope that Mr. Burnard, who was then 93, would expire before trial. Both defense motions were heard on May 16. The defendant withdrew his motion for a mental health examination, and the motion to depose Mr. Burnard was denied because the trial

15

was scheduled to start just three weeks later. There was no indication that John Burnard was having any health problems. Defense counsel stated that he was just concerned about Mr. Burnard's age. Unfortunately, Ella Burnard was already in hospice care and died before trial. She had been admitted to the Alzheimer's Unit at the nursing home where she was staying before her death. Testimony at the preliminary hearing indicated she had been having cognitive problems since 2014 to the extent that she would not have been competent to testify.

It was not possible to depose Ella Burnard when the defendant requested to do so, and John Burnard actually testified at trial even though there were two more continuances granted before the trial began on September 19, 2016. When the trial was delayed for the additional continuances, the defendant made no further requests to depose John Burnard.

## Habeas Corpus

The defendant asserts the court denied him the right of confrontation and due process by denying his omnibus motion for habeas corpus. He does not explain the manner in which his rights were denied. The ultimate right to confront the witnesses and test the sufficiency of evidence was afforded at trial.

## Bank Records

Defendant next asserts the court erred by allowing the Commonwealth to introduce banking and investment account records without authentication and compliance with Pa.R.E. 902.

16

The Commonwealth's expert accounting witness relied upon numerous banking and investment account records for his testimony. When the records were referenced, defense counsel objected that they had not been authenticated through a records custodian. The Commonwealth asserted that the records were self-authenticating pursuant to Pa.R.E. 902(11).

Although trial counsel had been retained by the defendant only a short time before trial, the Assistant Attorney General had served copies of all the records in question on the defendant's prior counsel many months before trial, and the records had a custodian of records certification attached. Defense counsel argues that a party intending to admit a record under Rule 902(11) must give written notice of that intention to the other side. Months before trial, the Commonwealth had supplied all the records and a copy of Mr. Houser's report in which he refers to those records. The Commonwealth gave notice that Houser would be testifying.

As such, I found that the Commonwealth had complied with the rule by giving the defendant reasonable written notice of its intent to offer the records into evidence. Certainly the defendant had a fair opportunity to challenge their accuracy. If defense counsel wanted to ask questions of the records custodian, he could have subpoenaed the custodian. The possible defense questions to which counsel referred did not relate to the accuracy of the records, but instead to their interpretation.

17

## Reference to the Stockers

The court's knowledge of the Stockers is based on sidebar conversations, since neither testified. The defendant's statement of matters complained of on appeal refers to Mike Stocker, Sr., and Mickey Stocker. It is my understanding that Mike Stocker, Sr. is Mickey Stocker's father.

The defendant complains of the court sustaining Commonwealth objections but provides no transcript references where the objections were raised. I will discuss the objections related to either Stocker which I was able to find in the transcript.

The initial reference to one of the Stockers occurred during the defense cross-examination of John Burnard. (N.T. pp. 69-74). In response to defense counsel's questions, Mr. Burnard testified that he had not called the police to bring charges against the defendant. Then counsel asked if Mr. Burnard initially believed that the folks from Senior Services were approaching him because of something Mike Stocker had done. The Commonwealth objected at that point and a sidebar conference occurred so defense counsel could explain the relevance of his questions.

Defense counsel stated that Mike Stocker was handling the Burnards' investment account and that some of the checks from that account went to Stocker's son and some went to the defendant. The Commonwealth represented that no checks going to the Stocker's son were part of the allegations against Picone, and that any checks going to the Stockers may well be the subject of a separate prosecution against them. I found that

18

evidence of someone else having improperly accessed other funds from the Burnards' account to be irrelevant as long as none of those funds were included in the Commonwealth's evidence. Defense counsel insisted that Mr. Houser's report included funds accessed by one of the Stockers and that Mike Stocker, Sr. was going to be called as a witness. The conference ended with defense counsel reserving the right to recall John Burnard after this other evidence was presented. Mr. Houser's testimony made no mention of funds that were allegedly accessed by either Stocker, and the defense failed to call Mike Stocker as a witness.

Later during the cross-examination of John Burnard (N.T. pp. 94-97), defense counsel asked Mr. Burnard if he had concerns toward the end of 2014 about the way his house in Virginia was sold. The Commonwealth objected to relevance. Defense counsel promised to tie in this line of questioning. When Mr. Burnard was asked about the specifics of the sale of the house, the Commonwealth again objected, and a sidebar occurred.

At sidebar, defense counsel offered that he wanted to show that the Burnards, toward the end of 2014, were examining what was occurring with their investments to show that both Burnards had the mental alertness to understand and evaluate what was happening with their money. I ruled that he could show they were reviewing their investments without getting into the specifics of the sale of the Virginia house, which was not an issue in the case.

19

The first Commonwealth objection I have found during Mr. Houser's testimony that related to one of the Stockers appears in the trial transcript starting at page 444. (N.T. pp. 443-448). Defense counsel referred Houser to his direct testimony that the Burnards had no history of writing large checks for gifts and then referred to a couple of checks in the Burnards' check register written to Mickey Stocker. The Commonwealth objected, and counsel came to sidebar.

The Commonwealth's objection was that anything written to Mickey Stocker was not a gift, but a theft of money not included in the charges against the defendant and, therefore, not relevant. In response, defense counsel referred to Mr. Houser's testimony that there was no history of large gift giving, but I pointed out that Mr. Houser had said there was no history of such gift giving **before** the period of the subject transactions in 2014. Counsel also argued the checks to Stocker were in Houser's log book which had been admitted into evidence, but I agreed with the Commonwealth that the log book had not been admitted. I asked counsel to explain how he would show the checks to Stocker were gifts. He said that he was not going to show they were gifts, only that the checks appeared in the check register. I then asked how that would be relevant.

Defense counsel then seemed to change direction and assert that Houser listed Stocker as a vendor and indicated that he was going to ask additional questions to clarify the issue, to which I agreed. There was no ruling at that time on the Commonwealth's objection, and the sidebar ended.

20

Defense counsel returned to the issue later during his cross-examination. (N.T. pp. 467-469). He asked Mr. Houser whether, in his report, he identified Mickey Stocker as a vendor. The Commonwealth made a relevancy objection. At sidebar, defense counsel stated that he wanted to show that Houser had mistakenly identified Stocker as a vendor as a way of challenging the accuracy of his report.

Houser had testified that he was retained to examine the transactions between the Burnards and Picone, and that identifying the vendors was just a by-product of that process. (N.T. p. 467). Potentially misidentifying a vendor had no relevance to Houser's testimony regarding the transactions between the Burnards and Picone, and so the objection was sustained.

Reviewing the transcript, I could find no other objections raised by the Commonwealth that related to either one of the Stockers.

## Mistrial Denied

Next, the defendant asserts error in the denial of his counsel's motion for a mistrial. As previously discussed in reviewing the evidence at trial, Leo Howell is an attorney whom the defendant retained to draft a document for Ella Burnard to sign by which she was to affirm that she was of sound mind and judgment and intended that five of the checks made out to the defendant were intended as gifts. Immediately after defense counsel announced he was calling Howell to the stand, Ms. Laucella, for the

21

Commonwealth, asked that the witness be advised of his rights before testifying. This request was made in front of the jury, and defense counsel objected. (N.T. pp. 542-564).

At sidebar, defense counsel said that he was tempted to ask for a mistrial, but did not ask for one at first. After admonishing counsel at sidebar for raising this issue in front of the jury, the sidebar ended. The jury was told that a recess was needed to discuss a matter with counsel. With the jury out, Howell was advised of his right against self-incrimination, and he indicated a desire to consult with counsel. After a brief recess, but still outside the presence of the jury, defense counsel said he was "renewing" his motion for a mistrial, informing me that Howell no longer wished to testify, and asking to colloquy the witness.

Howell testified, outside the jury's presence, that he was not going to testify because he felt threatened by the Attorney General. Defense counsel requested a dismissal of the case based upon prosecutorial misconduct. The motions for mistrial and dismissal were denied. An early lunch break was then called to give Mr. Howell ninety minutes to attempt consulting with counsel.

When we returned after lunch, defense counsel informed me that Howell had decided to testify after all but asked to first insert a short witness. That was done followed by Howell's testimony.

Prosecutorial misconduct will justify granting a mistrial only where the unavoidable effect of the conduct is to prejudice the jury to the extent that it is rendered

22

incapable of fairly weighing the evidence and entering an objective verdict. *Commonwealth v. Pierce*, 537 Pa. 514, 645 A.2d 189 (1994). It was my judgment that the suggestion that the witness should be advised of his rights before testifying, followed by the witness' decision to do so did not render the jury incapable of entering an objective verdict or even objectively weighing Mr. Howell's testimony. Had I advised the jury that advising a witness of his rights does not reflect a judgment on his credibility, I believe that a question of his credibility may have been planted in the jurors' minds. However, merely taking of an extended recess before he testified might very well have suggested to the jury that the witness had considered his rights and felt no concern about providing testimony.

## Restitution

The defendant asserts that the amount of restitution ordered is incorrect because the Commonwealth failed to establish what part of the funds transferred to the defendant from the Burnards' accounts were either a gift or a loan.

John Burnard testified that he was aware that his wife had made some gifts to the defendant, and that there was other money transferred to the defendant which he understood to be interest free loans. He spoke in general terms about gifts, but identified none of the transactions as a gift. When defense counsel specifically asked Mr. Burnard about the checks given to the defendant by his wife, he repeatedly stated his understanding that the money given to the defendant by check was intended as a loan.

23

The defendant argued to the jury that Ella Burnard had given over $300,000 of the Burnards' money in the form of gifts. However, the jury also heard testimony that Ella Burnard had cognitive problems at the time the alleged gifts were made. From that testimony the jurors could have, and apparently did conclude that she was not capable of forming the donative intent to give their money to the defendant. Getting an individual who is not aware of what she is doing to sign a check by which her money is taken from her bank account is a taking. That clearly is what the jury concluded happened here.

John Burnard testified that he was being informed that the transfers of funds to Picone, to the extent Mr. Burnard was aware of such transfers, were loans. That testimony was actually supported by the document Howell prepared for Ella Burnard to sign at the defendant's request, purporting to convert checks which has previously been designated as loans to gifts.

The defendant argues that a loan is not a taking; however, borrowing money with no intention of repaying the loan constitutes theft by deception. *See, Commonwealth v. Atwood*, 411 Pa. Super. 137, 601 A.2d 277 (1991); *Commonwealth v. Grife*, 444 Pa. Super, 362, 664 A.2d 116 (1995). There was no evidence that the defendant repaid any money to the Burnards even though he continued to take more of their money while expending large sums at casinos, remodeling his house and funding his business.

The defendant was not tried on theft by deception charges, but he was convicted of receiving stolen property, which requires that the defendant receive, retain, or dispose of

24

another's property with knowledge that it was stolen. It makes no distinctions about the manner in which the property was stolen. The evidence supports the conclusion that the defendant received, retained, and disposed of $319,501.60 of the Burnards money with knowledge that he stole it from them.

BY THE COURT,

_Baldwin, P.J._

Dated: _February 16, 2017_

25